IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| PAYA TOLIVER,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>INTEGRATED PROTEINS, LLC, et al.,<br><br>　　　　　Defendants. | Case No. 5:25-cv-06150-SRB<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Paya Toliver ("Plaintiff") and for her Second Amended Complaint against Defendants Integrated Proteins, LLC ("Integrated Proteins" or "Defendant"), ResourceOne Global LLC ("ResourceOne" or "Defendant"), and Joe Hubbard ("Hubbard" or "Defendant") (together "Defendants") states as follows:

## NATURE OF THE CASE

1. This action is brought to remedy workplace sexual harassment, discrimination on the basis of sex in the terms, conditions, and privileges of employment, and retaliation, all in violation of Section 701(b) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Missouri Human Rights Act, as amended, Mo. Rev. Stat. § 213.010, et seq. ("MHRA"). Plaintiff also brings this action for battery in violation of the common law of the State of Missouri.

2. The claims hereinafter alleged seek declaratory and injunctive relief and compensatory and punitive damages and penalties.

## PARTIES

3. Plaintiff is an individual citizen and resident of Kansas City, Missouri.

4. Defendant Integrated Proteins is a limited liability company formed under the laws of Wyoming with its principal place of business at 1480 NW Vivion Road, Kansas City, Missouri.

5. Defendant ResourceOne is a limited liability company formed under the laws of Missouri with its principal place of business at Westowne Office Park Building 10 Ste 1000, Liberty, Missouri

6. Defendant Joe Hubbard the founder and CEO of Defendant Integrated Proteins. He is an individual citizen and resident of Kansas City, Missouri.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this cause of action pursuant to 28 U.S.C. § 1331, 1337, and 1343(a)(4), as well as 42 U.S.C. § 2000e-5(f).

8. The United States District Court for the Western District of Missouri has personal jurisdiction over Defendants inasmuch as Defendants conducts business and/or reside within this District. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendants offices offices, conducts business, and/or can be found in the Western District of Missouri, and the cause of action set forth herein has arisen and occurred in substantial part in this District. Venue is also properly laid in this Court pursuant to 29 U.S.C. § 1132(e)(2) because Defendants have substantial business contacts within the State of Missouri.

9. On or about March 15, 2025, Plaintiff filed her Charge of Discrimination detailing the allegations included herein with the Equal Employment Opportunity Commission ("EEOC"), which was thereafter dually filed Plaintiff's Charge of Discrimination with the Missouri Commission on Human Rights ("MCHR").

10. On April 21, 2025, Plaintiff was issued her Notice of Right to Sue from the EEOC, authorizing her to proceed with her claims within 90 days thereafter. On October 17, 2025,

Plaintiff was issued her Notice of Right to Sue from the MCHR, authorizing her to proceed with her claims within 90 days thereafter.

## FACTS

11. Plaintiff was employed by Defendants as a Corporate Paralegal since May 8, 2023, until the termination of her employment on July 14, 2025. In this role Plaintiff reported to Integrated Proteins General Counsel and Chief Legal Officer Ben Hubbard for the duration of her employment until Mr. Hubbard's departure on January 7, 2025.

12. At all times material hereto, Defendants' employees were acting in the course and scope of their employment with Defendants, or were otherwise acting as agents of Defendants, and their conduct was authorized and ratified by Defendants.

13. Plaintiff's record of performance with Defendants has been exemplary. Plaintiff has regularly received merit-based increases in her pay. Plaintiff has also routinely received positive feedback from those with whom she has worked and to whom she has reported.

14. Plaintiff has been the victim of workplace sexual harassment involving verbal and physical contact of a sexual nature perpetrated by Integrated Proteins Founder and CEO Joe Hubbard since soon after her employment with Defendants began.

15. On September 2, 2023, Plaintiff attended a birthday celebration for then General Counsel and Chief Legal Officer Ben Hubbard organized and attended by approximately sixty colleagues at the Integrated Proteins corporate house, an off-site facility used for miscellaneous Integrated Proteins events. At the end of the evening Joe Hubbard escorted Plaintiff as she left the event and waited with her until her husband arrived to pick her up. While they spoke, Joe Hubbard asked about Plaintiff's "relationship situation" and she explained that she was happily married. Joe Hubbard responded, "that's a good thing" because "otherwise [he] would take [her] behind the bushes or over to the side of the house." Plaintiff did not respond.

16. Plaintiff met briefly with Joe Hubbard on September 6, 2023. She explained that he should be more careful about how he interacts with his employees because several of his comments on September 2 were inappropriate. Plaintiff explained that this was especially true for her because she had recently authored the workplace sexual harassment policy adopted by Integrated Proteins. Joe Hubbard responded by thanking Plaintiff for "having [his] back" because he didn't "need any more lawsuits."

17. On October 19, 2023, Plaintiff received a text message from Joe Hubbard's administrative assistant asking to meet with Plaintiff the following morning "in the confidence of you as a friend and legal professional." When they met the next day, she showed Plaintiff a series of text messages she had exchanged with Joe Hubbard that appeared to me to be part of his systematic effort to groom her with the intention of facilitating an inappropriate relationship with her as his subordinate.

18. On November 2, 2023, Plaintiff attended a dinner event as part of a birthday celebration for Network Engineer Shaun Crouse attended by Joe Hubbard and others. After dinner the group met at Arthur's Karaoke Lounge, where Joe Hubbard rejoined the others, including Plaintiff. At the end of the evening, Joe Hubbard insisted that Plaintiff meet him for a private conversation in a parking lot nearby. When they arrived, Joe Hubbard immediately began kissing Plaintiff and placed his fingers in her vagina. Plaintiff learned later that after Joe Hubbard left the parking lot, he picked up his administrative assistant and took her to his home in St. Joseph, Missouri. His administrative assistant told Plaintiff months later that when she awoke at Joe Hubbard's home the next day, she was naked and had no recollection of how she arrived there. She shared also that she believed that she had sex with Joe Hubbard without her contemporaneous knowledge or consent.

4

19. On November 14, 2023, Plaintiff arrived at work early sometime before 7 a.m. After her arrival, Joe Hubbard approached the cubicle in which Plaintiff worked and told her "I am so hard." Joe Hubbard placed his penis in Plaintiff's face and in her mouth and grabbed the back of Plaintiff's head so she could not move away from him.

20. Plaintiff began searching for work elsewhere the same day. Plaintiff exchanged text messages on November 17 and 21 with a friend who informed her of opportunities elsewhere for which she completed applications. Days later then General Counsel and Chief Legal Officer Ben Hubbard offered Plaintiff a raise if she agreed to stay, and Plaintiff reluctantly accepted his offer.

21. On December 8, 2023, Plaintiff agreed to meet Joe Hubbard outside work to object to how he had interacted with her since her employment began. Plaintiff intended to discuss boundaries with him and to explain that she had agreed to accept a raise and remain employed by Defendants on the condition that he agreed to stop treating her in the way had since her employment began. When Joe Hubbard picked Plaintiff up that day, she understood that they would meet at an area restaurant, and he instead took her to his home. At his home Joe Hubbard forced himself upon her and refused to allow her to leave. When they left his home, Joe Hubbard told her "every woman I meet falls in love with me."

22. On January 19, 2024, Plaintiff again agreed to meet with Joe Hubbard outside work to seek to maintain boundaries and to explain that she intended only to continue to work there without personal interaction with him of any type. Plaintiff asked Joe Hubbard to "leave me alone."

23. On January 22, 2024, Joe Hubbard pulled Plaintiff into a conference room and kissed her without her consent. Plaintiff pushed him away and explained that she wished only to

5

continue to work without his continuing harassment. Joe Hubbard demanded that Plaintiff look at him and he said "if I hurt your feelings it's because I am a stupid man."

24. On February 21, 2024, Joe Hubbard approached Plaintiff in her cubicle and told her "I don't know what's going on with you" and "I don't like feeling like I'm walking on eggshells around you." Joe Hubbard asked "do you want me to leave you alone?" and Plaintiff nodded that she did. Later he asked Plaintiff to come to his office and she explained that she no longer wished to interact with him unprofessionally in any way and that his advances were not welcome.

25. On March 23, 2024, Joe Hubbard's administrative assistant asked Plaintiff to meet with her. She explained that on November 3, she awoke naked at Joe Hubbard's home and had no recollection of how she arrived there. She also shared also that she believed that she had sex with Joe Hubbard without her knowledge or consent. During their discussion Plaintiff reluctantly shared her experience with Joe Hubbard on November 14. Joe Hubbard's administrative assistant urged Plaintiff to report her experiences to Vice President of Human Resources Shannon Vance. Plaintiff was reluctant to do so because she feared she would be retaliated against. Plaintiff explained to his former executive assistant that she would support her in every way and that Plaintiff had an obligation to report the events she had described. Plaintiff encouraged her to share the details she had shared with Plaintiff with Shannon Vance.

26. On March 25, 2024, Plaintiff reported the details of her conversation with Joe Hubbard's administrative assistant to Vice President of Human Resources Shannon Vance. Plaintiff explained also that she had been sexually harassed by Joe Hubbard in the same way. Ms. Vance was visibly shaken by the details Plaintiff shared with her but explained that she did not "have time to discuss these matters" further at that time. Ms. Vance agreed to speak with his administrative assistant about the events Plaintiff had described. Plaintiff learned later that she

spoke with Shannon Vance on these subjects on March 25 as well. Ms. Vance asked Plaintiff to meet with her later that afternoon to discuss her conversations with his administrative assistant. Ms. Vance also explained that she had "an obligation to report" the events involving Joe Hubbard's harassment of Plaintiff that she had described to her. Because Plaintiff feared retaliation and she wanted to keep her job, Plaintiff begged Ms. Vance not to report the concerns Plaintiff had described to her to Joe Hubbard or others. Plaintiff told her that Ms. Vance that she would lose her job immediately if Ms. Vance raised these issues with Joe Hubbard and that he would suffer no consequences of any type. Plaintiff told Shannon Vance "I'm not trying to make problems" and that she just wanted it to stop. Ms. Vance told Plaintiff she would "sit with the information and decide what to do." Plaintiff learned later that Ms. Vance raised these issues with Joe Hubbard in the ensuing days.

27. Plaintiff began to experience retaliation immediately thereafter. Those with whom Plaintiff regularly interacted as part of her work, including then General Counsel and Chief Legal Officer Ben Hubbard and Vice President of Human Resources Shannon Vance, began to distance themselves from Plaintiff and often sought to avoid Plaintiff altogether at work. Plaintiff's work was unfairly and unjustifiably criticized without explanation. Thereafter Plaintiff was not supported in her role as Corporate Paralegal, and her colleagues at work began to purposefully isolate her.

28. Plaintiff worked from home on March 28, 2024, and exchanged text messages with Joe Hubbard's administrative assistant the same day. When they met, she explained to Plaintiff that she had been asked to return all of Joe Hubbard's personal and business checkbooks in her possession and said she was asked to meet with Carrie Hubbard-Brown. Her employment was terminated at a meeting with Ms. Hubbard-Brown the following day.

7

Case 5:25-cv-06150-SRB     Document 33     Filed 11/04/25     Page 7 of 20

29. Later the same month Plaintiff sought to resolve an issue with a commodity code for a customer contract. Ben Hubbard immediately became upset with her after he learned of her efforts and raised his voice as he told Plaintiff "that's not your job" and that Plaintiff should "stay in [her] lane." Later Ben Hubbard arrived at the same conclusion Plaintiff had drawn regarding the commodity code issue.

30. On May 2, Plaintiff explained to Ben Hubbard that she needed Joe Hubbard's signature for an operating agreement with a new entity. When Plaintiff sent the agreement to Ben Hubbard for his review, he replied by explaining that she was no longer allowed to interact directly with Joe Hubbard and that "anything that needs to be signed by Joe needs to go through me."

31. On May 7, Ben Hubbard prepared and circulated a non-disclosure agreement and required each member of the Integrated Proteins legal department to sign it. Later the same month Ben Hubbard told Plaintiff that he would be "transitioning to the President role" and that he expected thereafter to hire an attorney to serve as Chief Legal Officer.

32. In June Ben Hubbard asked Plaintiff to meet with him and asked whether she had interest in serving as his administrative assistant when he became President of Integrated Proteins. Plaintiff responded that becoming an administrative assistant would be a "step backwards in [her] career" and that she preferred to remain as the paralegal for the Chief Legal Officer he expected to hire. Ben Hubbard said he was "interested in hiring one of the attorneys we work with" to serve as CLO and that he expected the attorney to select a paralegal of his or her choosing. Plaintiff understood that her employment was in jeopardy. Plaintiff's performance continued to be unfairly and unjustifiably criticized without explanation throughout the summer.

33. On July 16, 2024, Plaintiff joined Ben Hubbard and Executive Legal Assistant Kassie Vargas after work to discuss his expected three-week absence from work for vacation.

After Kassie left to use the restroom Ben Hubbard leaned over to Plaintiff and said "now that Kassie is gone I need to tell you that I know exactly how you feel about Joe and while you've said nothing untrue about him you need to stop talking shit about him and watch your back." He explained that Joe Hubbard was searching for a way to justify the termination of Plaintiff's employment and that he "wants you to be fired" but that he had been protecting Plaintiff from Joe. Plaintiff's conversation with Ben Hubbard confirmed her suspicion that her employment was in jeopardy.

34. On August 13, 2024, the legal department moved to the new corporate offices and Plaintiff was forced to interact with Joe Hubbard on a more regular basis.

35. In October 2024 Kassie Vargas resigned from Integrated Proteins and Ben Hubbard expressed his concern that her absence would disrupt the legal department significantly. Plaintiff met him after work to discuss further and Plaintiff explained that she had interviewed elsewhere and that she also felt she could no longer work with Defendants. Ben Hubbard listened as she explained in detail the manner in which she had been sexually harassed by Joe Hubbard and the retaliation she had experienced after she reported the harassment to Chief People Officer Shannon Vance. He became visibly upset with tears in his eyes as he expressed his regret that Plaintiff "had to deal with this at work" and committed that he would "take care of Joe." Thereafter Plaintiff's work relationship with Ben Hubbard improved until the unexpected termination of his employment weeks later.

36. On December 11, 2024, Plaintiff unexpectedly encountered Joe Hubbard for the first time in several weeks. At approximately 2 a.m. the following morning Joe Hubbard sent Plaintiff a direct message on Instagram and said he wanted to "go get coffee and apologize." Plaintiff declined to meet with him.

37. On January 7, 2025, Chief People Officer Shannon Vance told Plaintiff that Ben Hubbard was "on leave for an undetermined amount of time." Plaintiff attempted to contact Ben Hubbard, and he explained that his email and network access had been terminated without notice.

38. On January 13, 2025, Plaintiff met with Chief People Officer Shannon Vance and Joe Hubbard to discuss the status of the legal department. At their meeting Plaintiff learned that Ben Hubbard was no longer employed by Integrated Proteins and that the Company intended to hire outside counsel to serve as CLO. When Plaintiff asked to whom she would report, Shannon Vance told her "everything goes through Joe" but that she would be the one to "approve [her] PTO." After their meeting Plaintiff later insisted to Shannon that she needed some "buffer between me and Joe" based on her prior history with him.

39. On January 17, Plaintiff met with Joe Hubbard, Charlie Hubbard, Shannon Vance, and the attorney selected to serve as outside counsel, Pascale Henn. After their meeting Plaintiff pulled Pascale Henn aside and asked who her "real client" would be. Ms. Henn assured Plaintiff that she would "not let any executives make any illegal decisions" or "decisions that would work against the interests of the company."

40. On January 23, 2025, Plaintiff met with Joe Hubbard to discuss various operating agreements that required amendment. When they met Joe Hubbard asked her "how are you doing" and inquired about Plaintiff's recent arrangements to work occasionally from home. When Plaintiff said that her home life required attention Joe Hubbard said "you can do better than your husband" and explained that he "always thought [her] husband wasn't good enough for [her]."

41. On January 30, 2025, Plaintiff met with Joe Hubbard in her office at 3:30 p.m. He told Plaintiff "a couple of months ago I messaged you about getting coffee so I could apologize and clear the air." Joe Hubbard told her that he felt he "owed [her] more" and that he did not "do

right by [her]." He then asked if Plaintiff planned to divorce her husband, told her that "waiting is ridiculous," and offered to pay Plaintiff's moving expenses if she left her home. Joe Hubbard told her "you're special" and that she was "more important than everyone else."

42. On February 6, 2025, Joe Hubbard unexpectedly sent Plaintiff a request about product loads, a subject with which she did not have previous experience that would require a significant investment of time at the expense of her regular responsibilities. Plaintiff prepared a list of questions for him that would allow her to complete the report he had requested. At the same time, Plaintiff told Chief People Officer Shannon Vance that she was frustrated with these requests and that she felt she had become "the dumping ground for Joe's projects" that would undermine her ability to perform her other responsibilities. The following day Ms. Vance brought Plaintiff a self-help book on the subject of "setting boundaries."

43. On February 14, 2025, Joe Hubbard sent Plaintiff a text message and asked her to meet him for lunch to discuss the product loads report they had discussed. Plaintiff explained that she had already eaten but agreed to meet anyway. When they met Joe Hubbard asked her "is it wrong to say how beautiful you are?" They briefly discussed various work subjects and he asked if they could "talk personal." Joe Hubbard explained that he was "single now" and said "the timing is perfect with [her] failing marriage." He offered again to pay for Plaintiff's moving expenses so she could leave her marriage and her husband. Joe Hubbard said "I know your physical needs are not being met" and said "I can service you as much and as often as you want." His remarks made Plaintiff extremely uncomfortable, and she sought to leave the meeting as quickly as possible.

44. On February 17, 2025, Plaintiff called Ben Hubbard and described the February 14 meeting with Joe Hubbard. Plaintiff explained that she continued to feel harassed and that she had been retaliated against since she raised her harassment complaints with Shannon Vance months

before. Ben Hubbard instructed Plaintiff to begin documenting her conversations with Joe Hubbard and said "I will support you." Ben Hubbard added that he could not provide specifics but that he had learned details that would corroborate claims made by Joe Hubbard's former administrative assistant regarding his inappropriate and unwelcome sexual conduct with her at his home.

45. Plaintiff met again with Joe Hubbard on February 20 to discuss various work-related subjects. At their meeting Joe Hubbard again told her that he would pay her moving expenses if she left her home and her husband.

46. Plaintiff met with Chief People Officer Shannon Vance on February 21 at 2 p.m. Ms. Vance explained that the Company was no longer willing to offer severance to Ben Hubbard related to his departure from Integrated Proteins and asked for his door key code so that she could pack the items in his office. Ms. Vance then said "Joe has brought me up to speed about your situation with Ben" and that a "formal investigation will take place so that if this turns into a lawsuit the Company can say they did their due diligence and investigated." Plaintiff was confused by her remarks and Ms. Vance added "I want you to be in a good head space for this conversation." Plaintiff understood that her employment was in jeopardy.

47. Plaintiff's employment was terminated on July 14, 2025.

## COUNT ONE – WORKPLACE SEXUAL HARASSMENT IN VIOLATION OF TITLE VII AND THE MHRA

### DEFENDANTS INTEGRATED PROTEINS AND RESOURCE ONE

48. Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

49. The conduct of Defendants described herein created an abusive, hostile, offensive, and intimidating work environment which Plaintiff was forced to endure in willful violation of the civil rights laws, including Title VII and the MHRA.

50. The conduct of Defendants described herein constitutes pervasive and unwelcome conduct of a sexual nature which Plaintiff was forced to endure in willful violation of the civil rights laws, including Title VII and the MHRA.

51. Management representatives for Defendants knew and/or should have known of the pervasive and unwelcome conduct of a sexual nature which Plaintiff was forced to endure in willful violation of the civil rights laws, including Title VII and the MHRA

52. Defendants have failed to make good faith efforts to establish and enforce policies to prevent unlawful discrimination against their employees.

53. Defendants have failed to properly train or otherwise inform their supervisors and employees concerning the duties and obligations under the civil rights laws, including Title VII and the MHRA.

54. At all relevant times herein, Joe Hubbard was a supervisor with immediate (or successively higher) authority over Plaintiff, or a supervisor who Plaintiff reasonably believed to possess the ability to significantly influence employment decisions affecting Plaintiff even if Joe Hubbard was outside of the Plaintiff's chain of command.

55. Submission to the sexually offensive conduct either explicitly or implicitly became a term or condition of Plaintiff's employment.

56. Plaintiff's submission to or rejection of the sexually offensive conduct was used as the basis for employment decisions affecting Plaintiff.

57. The conduct described herein had the purpose or effect of substantially interfering with Plaintiff's performance or created an intimidating, hostile or offensive working environment.

58. A tangible employment action is a significant change in employment status. It is the means by which the supervisor brings official power of the enterprise to bear on subordinates, as demonstrated by the following: it requires an official act of the enterprise; it usually is documented in official company records; it may be subject to review by higher level supervisors; and it often requires the formal approval of the enterprise and use of its internal processes. A tangible employment action usually inflicts direct economic harm.

59. In light of Defendant's tangible employment actions against Plaintiff, Defendants are precluded under from raising affirmative defenses Defendants exercised reasonable care to prevent and correct promptly any sexually harassing behavior that Plaintiff failed to take advantage of preventive or corrective opportunities provided by Defendants or to avoid harm otherwise.

60. In engaging in the unlawful employment practices described herein, Defendants have acted in conscious and reckless disregard for Plaintiff's physical and emotional well-being and her federal and state protected civil rights.

61. The conduct of Defendants is outrageous due to its motive and/or reckless disregard for Plaintiff's federal and state protected civil rights, entitling her to an award of punitive damages.

62. As a direct and proximate result of the unlawful and discriminatory policies, practices and conduct of Defendants, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants the requested relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

14

Case 5:25-cv-06150-SRB    Document 33    Filed 11/04/25    Page 14 of 20

(A) Declaring all acts described herein related to the terms and conditions of Plaintiff's employment in violation of Title VII and the MHRA;

(B) Enjoining and permanently restraining Defendants from continued violations of Title VII and the MHRA;

(C) Directing Defendants to take such affirmative measures as are necessary to ensure that the effects of their unlawful practices and conduct are eliminated and do not continue to affect Plaintiff's employment opportunities;

(D) Directing Defendants to pay Plaintiff front pay, and to make Plaintiff whole for all earnings and benefits she would have received but for Defendants' unlawful practices and conduct, including, but not limited to wages, retirement earnings, and other lost benefits;

(E) Awarding Plaintiff compensatory and punitive damages;

(F) Awarding Plaintiff the costs of this action, prejudgment interest, and her reasonable attorneys' fees; and

(G) Granting such additional relief as the Court may deem just and proper.

## COUNT TWO – DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF TITLE VII AND THE MHRA

### DEFENDANTS INTEGRATED PROTEINS AND RESOURCE ONE

63. Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

64. The unlawful discrimination on the basis of Plaintiff's sex in the terms, conditions, and privileges of her employment by Defendants is discriminatory and intentional and constitutes a disparity in treatment of Plaintiff on the basis of her sex in willful violation of the civil rights laws, including Title VII and the MHRA.

65. Defendants have failed to make good faith efforts to establish and enforce policies to prevent unlawful discrimination against their employees.

66. Defendants have failed to properly train or otherwise inform their supervisors and employees concerning the duties and obligations under the civil rights laws, including Title VII and the MHRA.

67. In engaging in the aforementioned unlawful employment practices, Defendants have acted in conscious and reckless disregard for Plaintiff's physical and emotional well-being and her federal and state protected civil rights.

68. The conduct of Defendants is outrageous due to its motive and/or reckless disregard for Plaintiff's federal and state protected civil rights, entitling her to an award of punitive damages.

69. As a direct and proximate result of the unlawful and discriminatory policies, practices and conduct of Defendants, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants the requested relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

(A) Declaring all acts described herein related to the terms and conditions of Plaintiff's employment in violation of Title VII and the MHRA;

(B) Enjoining and permanently restraining Defendants from continued violations of Title VII and the MHRA;

(C) Directing Defendants to take such affirmative measures as are necessary to ensure that the effects of their unlawful practices and conduct are eliminated and do not continue to affect Plaintiff's employment opportunities;

(D) Directing Defendants to pay Plaintiff front pay, and to make Plaintiff whole for all earnings and benefits she would have received but for Defendants' unlawful practices and conduct, including, but not limited to wages, retirement earnings, and other lost benefits;

(E) Awarding Plaintiff compensatory and punitive damages;

(F) Awarding Plaintiff the costs of this action, prejudgment interest, and her reasonable attorneys' fees; and

(G) Granting such additional relief as the Court may deem just and proper.

# COUNT THREE – RETALIATION IN VIOLATION OF TITLE VII AND THE MHRA
## DEFENDANTS INTEGRATED PROTEINS AND RESOURCE ONE

70. Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

71. The unlawful retaliation against Plaintiffs by Defendants is intentional and has been undertaken in willful violation of the civil rights laws, including Title VII and the MHRA.

72. Defendants have failed to make good faith efforts to establish and enforce policies to prevent unlawful retaliation against their employees.

73. Defendants have failed to properly train or otherwise inform their supervisors and employees concerning the duties and obligations under the civil rights laws, including Title VII and the MHRA.

74. In engaging in the aforementioned unlawful employment practices, Defendants have acted in conscious and reckless disregard for Plaintiff's physical and emotional well-being and her federal and state protected civil rights.

75. The conduct of Defendants is outrageous due to its motive and/or reckless disregard for Plaintiff's federal and state protected civil rights, entitling her to an award of punitive damages.

76. As a direct and proximate result of the unlawful and discriminatory policies, practices and conduct of Defendants, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants the requested relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

(A) Declaring all acts described herein related to the terms and conditions of Plaintiff's employment in violation of Title VII and the MHRA;

(B) Enjoining and permanently restraining Defendants from continued violations of Title VII and the MHRA;

(C) Directing Defendants to take such affirmative measures as are necessary to ensure that the effects of their unlawful practices and conduct are eliminated and do not continue to affect Plaintiff's employment opportunities;

(D) Directing Defendants to pay Plaintiff front pay, and to make Plaintiff whole for all earnings and benefits she would have received but for Defendants' unlawful practices and conduct, including, but not limited to wages, retirement earnings, and other lost benefits;

(E) Awarding Plaintiff compensatory and punitive damages;

(F) Awarding Plaintiff the costs of this action, prejudgment interest, and her reasonable attorneys' fees; and

(G) Granting such additional relief as the Court may deem just and proper.

## COUNT FOUR – BATTERY
### DEFENDANT JOE HUBBARD

77. Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

78. During Plaintiff's employment and while she was performing responsibilities associated with her employment, Defendant Joe Hubbard openly and intentionally touched Plaintiff in an offensive and intimidating manner.

79. As a direct and proximate result of the intentional acts of Joe Hubbard, Plaintiff sustained injuries, pain, and mental suffering – including humiliation and indignity.

80. The conduct of Joe Hubbard showed a complete indifference to, and a conscious disregard for the health and safety of Plaintiff, thereby justifying an award of punitive damages in this matter.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

(A) Awarding Plaintiff compensatory and punitive damages;

(B)     Awarding Plaintiff the costs of this action, prejudgment interest, and her reasonable attorneys' fees; and

(C)     Granting such additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to trial by jury.

Respectfully submitted,

/s/ Lewis M. Galloway
Lewis Galloway          MO Bar No. 52417
LG Law LLC
1600 Genessee St Ste 918
Kansas City, MO 64102
Phone: (816) 442-7002
Fax:    (816) 326-0820
lewis@lglawllc.com

Chad C. Beaver          MO Bar No. 54141
Beaver Law Firm, LLC
1600 Genessee St Ste 920
Kansas City, MO 64102
(816) 226-7750 | Office
(816) 817-0540 | Fax
cbeaver@beaver-law.com

ATTORNEYS FOR PLAINTIFF

# CERTIFICATE OF SERVICE

    I hereby certify that on November 4, 2025, I electronically filed the foregoing with the clerk of the court using the ECM/ECF system, which accordingly provided service of the same via email to:

Jacqueline M. Longfellow
J. Tanner Murphy
Baker, Sterchi, Cowden & Rice, LLC
2400 Pershing Rd Ste 500
Kansas City, MO 64108
jlongfellow@bakersterchi.com
tanner.murphy@bakersterchi.com

ATTORNEYS FOR DEFENDANTS

                                        /s/ Lewis M. Galloway
                                        Attorney for Plaintiff